NORMA HALL, Special Adm'r of the Estate of Marion Hall, Deceased, Plaintiff-Appellee, v. NATIONAL FREIGHT, INC., *et al.*, Defendants-Appellants.

First District (6th Division) . No. 1—92—2134

Opinion filed March 31, 1994.—Rehearing denied July 6, 1994.

Thomas J. Keevers and Joseph P. Postel, both of Keevers & Hittle, of Chicago, for appellants.

Richard B. Rogich and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Norma Hall (Hall), special administrator of the estate of Marion Hall, deceased, filed a negligence suit under the Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, par. 1 *et seq.*) and under the Survival Act (Ill. Rev. Stat. 1985, ch. 110$^1$/$_2$, par. 27—6) against defendants, National Freight, Inc. (National), and Gary E. Thomas (Thomas), in connection with a vehicular accident. After a trial, the jury returned a verdict in favor of plaintiff, assessing the total amount of damages at $2,454,955.77, which it then reduced by 42%,

the percentage of negligence it found attributable to plaintiff's decedent, resulting in the sum of $1,423,874.35 as plaintiff's recoverable damages. Judgment was entered on the verdict, and defendants appeal.

The accident involved the collision of two semi-tractor-trailers which occurred at approximately 2 p.m. on March 7, 1985, on Interstate 94 in Cook County, Illinois. One of the vehicles was driven by plaintiff's decedent. The other vehicle was driven by Thomas in the course of his employment with National. The decedent was survived by his wife, plaintiff in this cause, who suffered pecuniary loss as a result of his death. Plaintiff alleged that as a result of defendants' negligence, the decedent was injured and suffered personal, pecuniary and permanent injuries, including his conscious pain and suffering prior to his death. She further alleged that had he survived he would have been entitled to bring an action for his damages, and that such action has survived him under the Survival Act.

Defendants filed their answer in which they denied all allegations of wrongdoing and asserted the defense of comparative negligence.

Before trial, the trial court conducted a hearing at which the parties presented their respective motions *in limine*. One of plaintiff's motions *in limine* concerned the applicability of the Dead Man's Act (Ill. Rev. Stat. 1991, ch. 110, par. 8—201). After hearing the arguments of counsel, the court sustained plaintiff's motion and ruled that Thomas could not testify as to the details of the accident.

John Matheussen, who at the time of the accident was the corporate claims counsel for National, testified for plaintiff, by way of his evidence deposition, that he hired National Claims Service, an investigating service located in Oakbrook, Illinois, to investigate the accident and gather all available physical evidence. He further testified that National also hired Packer Engineering, an accident reconstruction firm, shortly after the accident occurred.

Before Matheussen's evidence deposition was read to the jury, the trial court ruled, over plaintiff's objection, that the questions posed by plaintiff's counsel during Matheussen's evidence deposition resulted in a partial waiver of her objections concerning the Dead Man's Act. The trial court further ruled that defense counsel would have the right to read any questions and answers posed during that evidence deposition including those which had been posed by plaintiff's counsel.

Thereafter, testifying as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1102), defendant Thomas stated that the collision in which he was involved with the decedent occurred at a curve in the road on

southbound I-94. He further testified that he put his four-way emergency flashers on prior to the incident. Thomas admitted having previously given a typewritten statement wherein he failed to indicate that he turned on his emergency flashers before impact.

Thomas testified that, after the accident, he was interviewed at the scene by Illinois State Trooper James Minx. Thomas did not believe that Minx instructed him to go to a truck stop located at the 159th Street exit in Illinois, which was approximately one mile away. Rather, Minx told him that he was free to leave. Thomas informed Minx that he would be at a truck stop in Indiana, which was approximately 10 to 15 miles away, in the event that Minx wanted to speak with him further.

Wesley Gas, the tow truck driver who towed the decedent's vehicle from the scene of the accident, authenticated certain photographs which he had taken at the scene shortly after the accident occurred. He also authenticated certain photographs of the decedent's vehicle which he took at his towing service yard soon after the incident.

Trooper James Minx prepared a detailed diagram of the scene which included its general layout as well as certain observations he made from physical evidence located there. As part of his diagram, Minx filled in the supposed path of Thomas' vehicle during the accident. Minx based his placement of the vehicle solely on his conversations with Thomas. Prior to his testifying, defense counsel was allowed a detailed *voir dire* of Minx regarding his placement of the path of Thomas' vehicle on the diagram. Minx stated that said placement was based solely on Thomas' statements to Minx rather than on an independent investigation. The trial court ruled that defendants could not use their own diagram to cross-examine Minx regarding his placement of the path of the Thomas vehicle.

During the direct examination of Minx, who testified that he arrived at the scene shortly after the collision occurred at approximately 2 p.m., plaintiff's counsel used Minx's diagram of the scene solely for purposes of assisting the jury as to how the layout appeared at the time of the accident. Using an overlay, Minx then filled in the pertinent physical markings and findings at the scene. Defendants did not object to this procedure.

Minx testified that because there was a considerable amount of traffic at the scene following the collision, he instructed Thomas to leave. Since Minx did not have an adequate opportunity to thoroughly examine Thomas' vehicle for damage, he instructed Thomas to go to the Union 76 truck stop located about one mile away at the 159th Street exit in Illinois. Minx testified that he told Thomas that he wanted to examine the damage to his vehicle in order to determine

the points of contact, angles of impact, and the nature and extent of the damage. Minx testified that he never would have agreed to meet Thomas at a truck stop in Indiana because he believed that Indiana was outside his jurisdiction.

Fifteen to twenty minutes later, Minx proceeded to the 159th Street truck stop, but did not find Thomas or his vehicle present. He was therefore unable to conduct a detailed inspection of the physical damage done to Thomas' vehicle.

Steve Kvackey, an adjustor for the National Claims Service, the company hired by National to investigate the accident and to gather the physical evidence, testified that National hired him within two hours of the incident. Kvackey testified that after receiving his initial assignment, he immediately went to the scene of the accident, arriving there about 6:30 p.m. He later went to the towing service to take photographs of the decedent's vehicle. Kvackey further testified that during the five days following his initial investigation, he made several attempts to contact Matheussen. One of Kvackey's reasons for trying to contact Matheussen was his concern that he had not been given an opportunity to either observe or take photographs of defendants' vehicle. Kvackey authenticated a number of photographs of the decedent's vehicle taken at the towing service.

Dr. Nitin Sardesai, an emergency room physician who pronounced the decedent dead at St. Margaret's Hospital in Hammond, Indiana, took a history from the paramedics before he conducted his examination of the decedent. Sardesai testified by way of evidence deposition that based on his examination, the decedent had sustained massive chest trauma and that his entire chest wall was crushed and caved in. This massive injury, he stated, caused a number of broken ribs and internal injuries to the decedent's lungs and chest. Sardesai further testified that the decedent's injuries were competent producers of his death and in all likelihood would produce "intense pain." Sardesai also opined that the decedent's injuries were a competent producer of conscious pain and suffering.

Dennis Fredricksen, an investigator hired by plaintiff to investigate the accident, authenticated certain photographs which he took of the scene and the decedent's vehicle.

Susan Dodson, a personal friend of plaintiff and the decedent, testified that she remained a close friend of plaintiff after the decedent's death. She testified as to her observations of the close relationship between plaintiff and the decedent. She testified that plaintiff was a very happy person before the decedent's death and that the couple were "everything" to each other. Dodson further testified that after the decedent's death, plaintiff had become very reclusive, resentful and had a terrible outlook on life.

Curt Hon, one of the paramedics who assisted in extricating the decedent from the wreckage, testified that he did not arrive at the scene or reach the decedent until 2:26 p.m. Hon testified that by that time the decedent was still in a conscious state, but "mellow." However, moments before the decedent was actually freed and removed from his vehicle he became unconscious. Hon testified that he talked to the decedent, whose lips and fingernails were turning blue due to loss of oxygen, and explained to him that they were trying to "get him out as soon as possible" and that he should "just hang in there," to which the decedent responded by nodding in the affirmative.

Charles Jacobsma, another paramedic who arrived at the scene and assisted in extricating the decedent from his vehicle, testified that the decedent was pinned in his truck as though his body was in a vise. He indicated that this was the type of situation that would cause pain prior to going into shock. Jacobsma testified that the decedent was talking at the scene while trapped in his vehicle, but "wasn't screaming or anything."

Plaintiff Norma Hall testified in detail regarding the close relationship that she and the decedent, her husband, had before he was killed. She married the decedent at age 18 in eastern Kentucky, where they both were from. She and the decedent subsequently moved to Ohio, where they built a home. They had been married for 37 years at the time of the decedent's death.

Roland Ruhl, a professor of engineering at the University of Illinois, testified that he was retained as an accident reconstruction expert on behalf of plaintiff. Ruhl reconstructed the accident based on all the physical evidence made available to him. Ruhl opined the accident was caused by Thomas' changing lanes and cutting off the decedent, who was forced into a concrete barrier. Ruhl also indicated that he had been given copies of National's repair records relating to Thomas' vehicle. He further indicated that the quality of those records in terms of adequately reflecting the damage to the vehicle was "pretty poor." Ruhl testified that the decedent's vehicle was entirely in the left lane at the point of impact and indicated that the physical evidence found at the scene supported his conclusion.

Testifying for the defense were Cecil Harris, James Noone and Greg Caulton. Harris, a truck driver who was a companion and co-worker of Thomas at the time of the incident, testified by way of his evidence deposition that he was traveling ahead of Thomas in the same lane just before impact. Harris testified that any observations he made regarding the accident, however, were made some 30 seconds before impact. Although he did not see the accident, Harris did

observe Thomas' left turn signal in use just prior to the accident. Harris also testified that immediately after the accident, he walked over to the decedent's vehicle where he heard the decedent pleading "please help me."

Noone, who was also called by way of evidence deposition, was the present claims manager for National. He authenticated photocopies of repair records regarding damage done to the Thomas vehicle. Noone testified that the originals were destroyed.

Caulton, the accident reconstruction expert hired by defendant to reconstruct the accident, testified that he had difficulty interpreting the repair records relating to the damage done to Thomas' vehicle. Caulton testified that the records placed the damage to the vehicle on the side opposite to that which he would have expected damage to occur. Caulton opined that due to the decedent misjudging his speed, the decedent had to make an emergency swerve to the left. This in turn caused him to lose control of his vehicle and swerve across the left lane into a concrete barrier.

On appeal, defendants contend that: (1) the trial court erred in not allowing Thomas to testify on his own behalf; (2) the evidence so overwhelmingly favors defendants that the verdict should not stand; (3) the evidence of Thomas' post-occurrence activities and the giving of the "missing evidence instruction" deprived defendants of a fair trial; and (4) the jury's verdict was excessive and was the result of passion and prejudice, consideration of facts not in evidence and an improper averaging procedure, where: (a) the jury was improperly prejudiced by evidence of the widow's grief; (b) the jury improperly supplied its own evidence of lost income; and (c) the evidence failed to establish that the decedent experienced conscious pain and suffering.

Defendants first contend that the trial court erred in not allowing Thomas to testify on his own behalf. Defendants assert that section 8—201(a) of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 8—201(a)), representing an exception to the Dead Man's Act, applies in the present case. They argue that under this exception, plaintiff waived any protection provided by the Dead Man's Act not once, but at least four times through witnesses Matheussen, Ruhl and Thomas.

The Dead Man's Act and the exception at issue provide, in relevant part:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased

\*\*\* or to any event which took place in the presence of the deceased \*\*\*, except in the following instances:

(a) If any person testifies on behalf of the representative to any conversation with the deceased \*\*\* or to any event which took place in the presence of the deceased \*\*\*, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." Ill. Rev. Stat. 1991, ch. 110, par. 8—201.

A review of the record reveals that the trial court ruled, over plaintiff's vigorous objections, that plaintiff had partially waived the protection of the Dead Man's Act. Despite this fact, defendant made no effort to call Thomas, who was present during the entire trial, as a witness following the court's ruling in this regard. Furthermore, defendants failed to even question whether any ambiguity existed regarding the scope of the court's ruling or the strictures which remained from the court's original ruling on the motion *in limine* plaintiff brought with respect to the application of the Dead Man's Act. Finally, defendants made no offer of proof as to what the allegedly barred testimony of Thomas might have been had he been called as a witness by defendants in their case. As such, defendants failed to preserve this issue for appeal. However, because this issue involves a substantive right, we will consider it.

During their post-trial arguments before the trial court, defendants themselves conceded that the real issue here was one of waiver, admitting they made no offer of proof as to the proposed testimony of Thomas. Notwithstanding this fact, they claimed that an offer of proof was unnecessary because it was clear what the testimony of the witness would be absent such an offer.

Plaintiff asserts that this argument is erroneous for several reasons, not the least of which is the fact that the trial court had already vacated its *in limine* order, thereby raising a substantial question as to precisely what additional testimony defendants would have offered but failed to actually present at trial. Plaintiff argues that the absence of an offer of proof under these circumstances was critical. We agree.

■ Defendants concede that Thomas was extensively cross-examined before the jury and that much of his testimony regarding the accident was already before it. Therefore, in order to establish that they were precluded from introducing any additional evidence, an offer of proof was necessary. Moreover, when the trial court ruled that the Dead Man's Act had been partially waived, the scope of that waiver could and should have been explored with the court. Instead, defendants chose to make no effort to revisit with the court the issue

of the *in limine* order or to ask the court to reconsider the limits placed on the testimony of Thomas, in light of its ruling of partial waiver.

Given the facts in the present case—where notwithstanding the trial court's ruling that plaintiff had partially waived the protections of the Dead Man's Act, defendants failed to call Thomas as a witness, to ask the court to clarify its ruling, or to make an offer of proof— defendants may not now claim that the scope of the initial ruling pertaining to the application of the Dead Man's act was too broad. Any purported prejudice arising from this ruling is waived. We are unpersuaded by defendants' argument, which the trial court rejected at the post-trial hearing, that they had no obligation to make an offer of proof as "everyone" was aware of what Thomas' proposed testimony would have been. Defendants' trial counsel argued that it was not "incumbent upon defendants to come forward and effectively risk a mistrial by violating this Court's *in limine* rule in order to preserve this issue for appeal." Defendants' counsel then argued that he did not believe that there could be any "partial waiver as to an event where that event is a single automobile accident." In light of the above, it is apparent that counsel was at least aware that some question existed as to the scope of the trial court's pretrial ruling following its subsequent ruling that there had been a partial waiver of the protections afforded by the Dead Man's Act.

We find that defendants' claim that no offer of proof was required under the circumstances existing in this case is clearly erroneous. Recognizing that "where the attitude of the trial court is such as to prevent a party from presenting offers of proof, none are necessary in order to preserve for review the court's rulings which exclude evidence" (*Aguinaga v. City of Chicago* (1993), 243 Ill. App. 3d 552, 572, 611 N.E.2d 1296, 1311), we do not find defendants' argument persuasive that such an offer by defendants would be contemptuous where there is no evidence in the record that the trial court precluded an offer of proof. In examining the report of proceedings, there is no indication that defendants made any attempt to call Thomas as a witness or to make an offer of proof. Such an offer of proof through Thomas would have been invaluable as it would have crystallized the issue, allowing for a necessary clarification or revision of the revised order and avoiding any subsequent confusion on the part of defense counsel as to whether he would be permitted to call Thomas as a witness. We therefore hold that defendants have waived the issue for failure to provide an offer of proof or, at the very least, to inquire as to the scope of the ruling following the finding of a partial waiver.

Defendants contend that the trial court's ruling that the Dead

Man's Act was only partially waived on account of Matheussen's testimony regarding his conclusions drawn from certain accident descriptions contained in various reports stands in strong contrast to this court's holding in *Goad v. Evans* (1989), 191 Ill. App. 3d 283, 547 N.E.2d 690, where a complete waiver was found to exist. However, we find *Goad* to be distinguishable from the present case. In the present case, Matheussen testified as to his conclusions regarding certain accident descriptions contained in various reports. He did not testify, as the plaintiff did in *Goad*, to facts which only the defendant and the decedent knew. See *Hoem v. Zia* (1992), 239 Ill. App. 3d 601, 606 N.E.2d 818, *appeal granted* (1993), 151 Ill. 2d 564, 616 N.E.2d 334.

Defendants next contend that the evidence so overwhelmingly favors them that the judgment for plaintiff should not stand. Defendants assert that when viewing the evidence in the light most favorable to plaintiff, the accident could not possibly have occurred in the manner she alleges. Defendants argue that the uncontroverted evidence in this case, namely the skid mark, conclusively established that the right tires of the decedent's vehicle were in the right lane, that is, Thomas' lane, by a minimum of two feet when the decedent first applied his brakes. Defendants further argue that plaintiff's theory that the decedent was traveling in the left lane and that the accident happened when Thomas changed lanes into the decedent's vehicle was wholly unsupported, where plaintiff produced no evidence controverting the plain meaning of the skid mark.

Based on the trial testimony of Minx, who noted the location of the skid mark, and of Caulton, their expert, who explained it, defendants argue that the fact that the skid mark angled right up to the retaining wall, which was to the left of the decedent's vehicle, conclusively established that it was made by the left tires of the decedent's vehicle since the tires on the right side of the decedent's vehicle could not have contacted the retaining wall on the left. Defendants further argue that this point was conceded by plaintiff's expert, Ruhl. Defendants then assert that the skid mark must have begun in the right half of the left lane since half a lane is six feet wide and the truck (and trailer, as Ruhl testified) were eight feet wide. The right side of the decedent's vehicle was therefore at least two feet into the right lane when he first applied his brakes and caused the skid mark. It further establishes that Thomas' vehicle was in the right lane entirely since the right front corner of decedent's truck struck the left rear of Thomas' trailer. Defendants argue that the skid mark provides the uncontroverted answer to the question upon which the whole case turns: Was Thomas wholly in his own lane when he was rear-ended by the decedent or did Thomas cut off the decedent while the decedent was passing in the left lane?

Ruhl, who was not present at the scene, provided the only testimony relative to plaintiff's allegation that Thomas cut in front of the decedent. Ruhl ignored the skid mark and any inference which could be drawn from it. Defendants assert that Ruhl's opinion is conclusory and unsupported by direct evidence.

Defendants argue that although the skid mark is physical evidence and not the testimony of an eyewitness, the principle that a reconstruction expert may not be called to impeach a competent, credible eyewitness should apply since the skid mark allows but one conclusion and plaintiff has provided no alternative explanation as to how the decedent could have encroached into Thomas' lane by two feet but not have been more than 50% negligent. Moreover, they claim that since Ruhl was the only plaintiff's witness to testify as to how the accident happened and his testimony was based on conjecture, the jury's verdict must have been based on conjecture. Defendants therefore claim that when a verdict is based on conjecture, a judgment notwithstanding the verdict is required or, in other words, the *Pedrick* standard applies. Under that standard, a judgment *n.o.v.* should be entered when all the evidence, considered in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Defendants also argue that, even if a judgment *n.o.v.* is not granted, at the very least, defendants are entitled to a new trial since the verdict is against the manifest weight of the evidence. Finally, defendants maintain that this case deserves a high level of scrutiny, since even in the face of prejudice to defendants, the jury found the decedent 42% negligent.

We find, however, that this judgment was hardly against the manifest weight of the evidence merely because there was a conflict between the conclusions drawn by the two reconstruction experts as to how to resolve the disputed testimony. Simply because defendants' expert has a differing view as to how the evidence should be interpreted does not mean that the testimony of plaintiff's expert witness should be declared incompetent. Such a result defies common sense as well as the law. Defendants fail to offer any supporting authority for their claim that Ruhl's testimony was incompetent as a matter of law. Indeed, the same argument was rejected by this court in a case coincidentally involving the same expert, Ruhl. See *Robles v. Chicago Transit Authority* (1992), 235 Ill. App. 3d 121, 601 N.E.2d 869.

The testimony of expert witnesses is to be considered in light of their qualifications, the quality of their testimony, and their

credibility. (*Rural Electric Convenience Cooperative Co. v. Illinois Commerce Comm'n* (1982), 109 Ill. App. 3d 243, 440 N.E.2d 404.) The same rules of weight and credibility that are applicable to other witnesses are used to judge the testimony of experts. (*Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 558 N.E.2d 493.) The conflicting testimony of experts generally raises an issue which is determinable by the trier of fact, who is in a better position to review pertinent exhibits and to assess witness credibility. (*Falkenbury v. Elder Cadillac, Inc.* (1982), 109 Ill. App. 3d 11, 440 N.E.2d 180.) Indeed, the jury, as the trier of fact, is entitled to believe one expert over the other where the experts offer divergent conclusions. *Wille v. Navistar International Transportation Corp.* (1991), 222 Ill. App. 3d 833, 584 N.E.2d 425.

■ Applying the foregoing principles, it is clear that the dispute in the testimony between the expert witnesses in the present case was properly left to the jury for resolution. That the jury, hearing both versions, ruled in favor of plaintiff and against defendants was well within its discretion to do. In *Robles*, this court held that "[w]hether [reconstruction testimony] may be used in addition to eyewitness testimony is determined by whether it is necessary to rely on knowledge and application of principles of science beyond the ken of the average juror." (*Robles*, 235 Ill. App. 3d at 138, 601 N.E.2d at 880.) In that case, we held that the trial court did not abuse its discretion in allowing the reconstruction expert, Ruhl, to testify.

In the present case, it is true that defendants' expert disagreed with the expert retained by plaintiff. As *Robles* makes clear, however, the decision whether to allow a reconstruction expert to testify is generally left to the sound discretion of the trial court, even in the presence of eyewitness testimony. We are unpersuaded by defendants' urging that we abandon the abuse of discretion standard and instead adopt defendants' claim that the "physical evidence" conclusively supports their view of the collision, particularly in light of the fact that there is no eyewitness testimony, only physical evidence, a point conceded by defendants. We conclude that the trial court did not abuse its discretion in allowing Ruhl to testify, where the placement of the skid mark was merely one disputed fact in a series of disputed facts presented not only by the experts but by other witnesses as well. Those witnesses presented sufficient evidence to support the jury's finding that defendants were liable for this occurrence. We further note that the jury weighed the respective responsibility of this collision and assessed a greater degree of fault against defendants than that which was assigned to the decedent. The damages awarded to plaintiff were reduced by this percentage in conformance with the principles of comparative fault. We reject defendants' argument that

the judgment should be set aside as against the manifest weight of the evidence or that their evidence should be given greater weight simply because the jury found the decedent to be guilty of a lesser degree of fault than defendants; defendants have already been afforded the advantage of a reduction of damages on the basis of comparative fault.

Defendants next contend that evidence of Thomas' post-occurrence activities and the giving of the "missing evidence instruction" deprived defendants of a fair trial. Specifically, they assert that certain inferences concerning Thomas' post-occurrence activities which allegedly had nothing to do with the accident were "enormously prejudicial" and caused the jury to find against him where there otherwise was a complete lack of evidence that Thomas had acted negligently.

Defendants first point to the conflict in the testimony regarding the alleged directive Minx gave to Thomas as he was leaving the scene. Minx claimed that he asked Thomas to go to a Union 76 truck stop so that he could have a second look at the damage, while Thomas testified that when he was leaving the scene, he told Minx that he was going to a TSA truck stop for repairs and that he would be there for awhile in the event Minx needed to talk to him further. Thomas further testified that he went to the TSA truck stop, where he remained for about two hours. Defendants argue that notwithstanding the fact that Thomas' testimony was corroborated by Harris, plaintiff nevertheless "paint[ed] for the jury a picture of something furtive and sinister" by coupling the conflicting testimony with the fact that defendants had no photographs of their truck. The trial court gave the jury the missing evidence instruction, Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1981) (IPI Civil 2d), which defendants contend specifically permitted the jury to make such inferences.

■ A review of the record reveals that defendants did not object to the giving of the missing evidence instruction during the instruction conference. Accordingly, we find that defendants have waived this argument on appeal.

Furthermore, with regard to the comments made by plaintiff's counsel to the jury about missing evidence and concealment, which defendants contend impacted on what they believe to have been an abuse of the trial court's discretion in deciding to give IPI Civil 2d No. 5.01, we note that defendants' trial counsel failed to raise any objection to these remarks at trial and in doing so, defendants have waived the right to raise them as error before this court. *Baird v. Adeli* (1991), 214 Ill. App. 3d 47, 573 N.E.2d 279.

Lastly, defendants contend that the jury's verdict was excessive and was the result of passion and prejudice, consideration of facts not in evidence and an improper averaging procedure. As to the argument that the verdict was the result of passion and prejudice and of facts not in evidence, defendants specifically contend that: (a) the jury was improperly prejudiced by evidence of the widow's grief; (b) the jury improperly supplied its own evidence of lost income; and (c) the evidence failed to establish that the decedent experienced conscious pain and suffering.

In their first contention of this final argument, defendants assert that although it is well settled that in assessing pecuniary loss, the jury may not consider the grief or sorrow of the widow, the jury, in the present case, heard an abundance of testimony concerning plaintiff's grief and sorrow subsequent to the decedent's death which included that of Susan Dodson, plaintiff's personal friend, as well as that of plaintiff herself. They argue that testimony of this kind can only adversely affect a jury, causing them to return a verdict ruled by passion. Defendants further argue that although plaintiff and the decedent were married for many years, the duration of the marriage, by itself, is not enough to support the award of $1.7 million for loss of society which they claim exceeds any reasonable estimate of fair compensation. Moreover, they assert that "[t]he inherently subjective nature of a loss of society claim cannot be used to allow a party to recover indirectly what cannot be recovered directly; that is, damages for sympathy, passion or sorrow." Defendants claim that the $1.7 million loss of society award in this case bears no rational relationship to the claimed loss, is against the manifest weight of the evidence, and is the result of passion and prejudice.

■ A review of the record reveals that the examples given by defendants to demonstrate that the trial court erred in allowing the jury to hear "an abundance of testimony concerning [plaintiff's] grief and sorrow after her husband's death" are very brief compared to the lengthy testimony of both witnesses. The first example amounts to two brief paragraphs taken from the testimony of Susan Dodson, and the second is a single question posed to plaintiff along with her corresponding answer. More important, however, is the absence of an objection by defendants to this testimony at trial. As stated previously, the failure to properly object to allegedly improper testimony waives the right to raise those matters on appeal. (*Baird*, 214 Ill. App. 3d at 65, 573 N.E.2d at 290.) Moreover, to be effective, counsel's objection must specifically state the ground for exclusion unless it is obvious from the context. *Baird*, 214 Ill. App. 3d at 65, 573 N.E.2d at 290.

We note with regard to the excerpt of Dodson's testimony to which defendants refer that immediately prior to that testimony being elicited defense counsel objected to the following question asked of Dodson by counsel for plaintiff: "Let's talk about your observations with Norma after this occurred. Tell us what you noticed about her." As a basis for his objection, defense counsel argued that such evidence was only relevant if plaintiff was entitled to compensation for emotional distress and that under Illinois law, she was not. The trial court, however, allowed the testimony, ruling that plaintiff's counsel had "the right to go into the loss of society, companionship *** [a]nd [that] loss of society can be demonstrated by direct observations, circumstantial evidence." Notwithstanding this ruling, if defense counsel felt that the testimony which immediately followed—the passage which is one of the two to which they now take exception—was testimony concerning plaintiff's grief and sorrow as opposed to her loss of society, they should have objected after the testimony was elicited. We are therefore unpersuaded by defendants' argument that the court's overruling of defendants' objection rendered further objections unnecessary, including one after plaintiff herself described her Friday nights, where the additional testimony elicited allegedly related to plaintiff's grief and sorrow not loss of society. We also note that defendants failed to raise this issue in their post-trial motion. Moreover, we find that these comments were not so improper or prejudicial as to deprive defendants of a fair trial. *Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 581 N.E.2d 162.

In their next contention, defendants claim that the jury improperly supplied its own evidence of lost income and that the impermissible consideration of this evidence by the jury requires a new trial. This argument is based solely upon the affidavit of one juror who stated that the jury's result was based on an improper averaging procedure. We note that after the jury returned its verdict, the jurors were polled, and all stated that it was a unanimous verdict.

Based on our review of the record, we find that the trial court properly disregarded the affidavit of one juror as it was merely an attempt to explore the motive, method or process by which the jury in this case reached its verdict. Rather than relaying that the integrity of jury deliberations had been violated by outside documents brought in by a juror or another, by an independent investigation conducted outside the jury room, or any other recognized exceptions to the general rule prohibiting the use of juror affidavits, the affidavit in question goes well beyond the practice condemned in *Chalmers v. City of Chicago* (1982), 88 Ill. 2d 532, 431 N.E.2d 361. Furthermore, it violates the exception noted in *People v. Holmes* (1978), 69 Ill. 2d 507,

372 N.E.2d 656. We therefore hold the trial court's decision to disregard the affidavit was proper.

Defendants also contend that the evidence failed to establish that the decedent experienced conscious pain and suffering. Notwithstanding that failure of evidence, they contend the jury awarded plaintiff $750,000 for the decedent's conscious pain and suffering. Defendants claim that when witnesses saw him, the decedent did not appear to be in pain. Specifically, they argue that Hon testified that the decedent was conscious but in a mellow state beyond the point of pain. They argue that the testimony of Jacobsma is similar where he stated that the decedent was "pretty well into shock" and "wasn't complaining of a great deal of pain or anything." Despite this testimony of Jacobsma, plaintiff's counsel, over objection, elicited from Jacobsma speculative testimony when he asked him whether this was "the type of thing that can be something that can produce pain," to which Jacobsma replied, "Yeah, ... If you put your whole body in a vise, it's definitely going to cause you pain." Defendants assert that this testimony does not establish that the decedent was in pain, particularly when viewed in light of his direct testimony that the decedent did not appear to be in pain. Further speculative, they contend, is Dr. Sardesai's testimony, based on hypothetical information, that the decedent's injuries "could" have produced conscious pain and suffering. Defendants contend that this evidence should not have been admitted into evidence where the doctor admitted that the only basis for his opinion was the fact that the decedent was talking at the scene.

Defendants further assert that even if there had been evidence of conscious pain and suffering, the $750,000 verdict is excessive and suggests that this court grant the defendants a new trial on the issue of damages unless plaintiff stipulates to reduce the award.

It has been established that a jury can consider evidence regarding a decedent's injuries when determining whether the decedent experienced conscious pain permitting recovery under the Survival Act. (*Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, 505 N.E.2d 1239.) It is not required that medical testimony be offered to establish conscious pain and suffering where lay testimony describing a decedent's actions prior to death coupled with evidence concerning his injuries is sufficient to support a recovery. (*Moore v. Swoboda* (1991), 213 Ill. App. 3d 217, 571 N.E.2d 1056.) In making such a determination, an important factor is evidence indicating that the decedent was conscious prior to death. (*Moore v. Swoboda*, 213 Ill. App. 3d 217, 571 N.E.2d 1056.) Therefore, damages for conscious pain and suffering may be sustained where the

decedent was shown to have been conscious prior to death and there is evidence from lay witnesses regarding what took place prior to the cessation of consciousness. *Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, 436 N.E.2d 623.

The record reveals that Minx testified that the accident occurred at about 2 p.m. Hon testified that he did not get to the scene or reach the decedent until 2:26 p.m. Therefore, by the time Hon reached the decedent, approximately 26 minutes had elapsed. According to Hon's testimony, Hon spoke to the decedent at the scene and the decedent indicated that he understood Hon by nodding in the affirmative while still trapped in the wreckage. The decedent, however, was obviously in distress as Hon testified the decedent's lips and fingernails were turning blue due to loss of oxygen. Jacobsma, the other paramedic assisting Hon, corroborated the fact that the decedent was conscious at the scene. He testified that the decedent was talking at the scene while pinned in his vehicle as though his body was in a vise, a situation which would cause pain prior to going into shock.

Moreover, another eyewitness, Harris, who was Thomas' coworker and companion, testified for the defense that he was traveling ahead of Thomas. Although he did not see the accident, Harris stated that he went to the scene immediately afterwards and heard the decedent, who was trapped in his vehicle, pleading for help, stating "please help me" over and over again.

Finally, Dr. Sardesai opined that the decedent's injuries were likely to produce "intense pain." He based his opinions as to pain and suffering on his experience as an emergency room physician, his examination of the decedent at the hospital and the information that he took from the paramedics concerning the decedent's condition in the normal course of his duties.

Therefore, the unrebutted testimony of at least two eyewitnesses, Hon and Jacobsma, establishes that the decedent was trapped in the wreckage of his vehicle and conscious for at least 26 minutes before the paramedics arrived. Although the decedent became "mellow" or slipped into a state of shock sometime after the paramedics arrived, he had remained conscious, experiencing pain and suffering, for a substantial period of time. We therefore find that the evidence was more than sufficient to support the recovery for pain and suffering.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and GIANNIS, J., concur.